## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

JIMMY PARIS                                                                      PLAINTIFF

v.                                        NO. 4:04CV0656 JLH

UNION PACIFIC RAILROAD COMPANY                                     DEFENDANT

## OPINION AND ORDER

Jimmy Paris brought this action against his employer Union Pacific Railroad Company, under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq.  He claims that his work at Union Pacific caused him to develop carpal tunnel syndrome.  Arguing that Paris's claim is barred by FELA's statute of limitations, Union Pacific has now moved for summary judgment.  For the following reasons, Union Pacific's motion is denied.

## I.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005).  A genuine issue of material fact exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

## II.

Paris was employed as a railroad conductor by Union Pacific for over 30 years.  Paris's job with the railroad required him to use his hands frequently to hold onto the grab irons on the rail cars,

throw line switches, apply hand brakes, straighten drawbars, and pull pins.  In 2000, Paris began experiencing tingling, numbness and pain in his hands.  The symptoms would come and go.  Paris experienced the symptoms when he performed activities both at home and at work.  Activities such as mowing his lawn, driving his truck, and operating his weed eater aggravated the symptoms.

Sometime before June 22, 2001, Paris saw a flier advertising carpal tunnel syndrome screening for employees of the railroad.  The screening was sponsored by two law firms.  Paris decided to go to the screening to see if he could find out what was wrong with his hands.  Before June 22, 2001, Paris had not been tested for carpal tunnel syndrome or sought medical treatment for his symptoms.

At the screening, Paris filled out an occupational disease screening questionnaire.  Paris stated on the form that no one at Union Pacific had ever warned him that his job could cause him to develop a cumulative trauma disorder such as carpal tunnel syndrome.  When asked to circle the risk factors for carpal tunnel syndrome to which he was exposed, Paris circled both force and grip as well as awkward hand posture.  As a specific explanation for how Paris was exposed to force and grip risk factors, Paris wrote "holding onto grab irons on rail cars and engine[s,] climping [sic] lad[ders, and] aplying [sic] hand brakes."  As a specific explanation for how Paris was exposed to awkward hand posture risk factors, Paris wrote "geting [sic] on and off moving equipment[,] lining air hoses[,] adjusting and opening couplers[, and] replacing air hoses and knuckles."

Paris also filled out a power of attorney dated June 22, 2001.  The power of attorney authorized the lawyers for the two law firms sponsoring the carpal tunnel screening to "represent [Paris] in [his] claim for all damages against [his] railroad employer, as a result of Carpal Tunnel

2

Syndrome." The power of attorney also stated that it may be revoked "if medical evidence or x-rays disclose that [Paris has] no compensable disease."

Paris was tested at the screening but did not receive any information about the results of the tests while he was at the screening. Dr. Robert Cohen, a family practice physician, was hired by the law firms to interpret the results of the screening. Dr. Cohen did not examine those workers who went to the screening but only reviewed their occupational disease screening questionnaire and their test results. Dr. Cohen testified in his deposition that his review was not a final diagnosis but was only to determine if an individual was at risk for carpal tunnel syndrome. Dr. Cohen would advise whomever he found to be at risk to follow up either with that person's regular doctor or a specialist. In a letter dated August 23, 2001, Dr. Cohen stated that "[w]ithin a reasonable degree of medical certainty, based on the patient's history and physical examination and electrical tests, Mr. Paris is suffering from carpal tunnel syndrome due to repetitive motion as a result of his work."

When Paris received Dr. Cohen's letter, his symptoms were still intermittent. His condition worsened, however, and in June of 2002 Paris decided to see Dr. P.B. Simpson, a board certified neurosurgeon. Dr. Simpson wrote in Paris's medical records that Paris had been experiencing symptoms for approximately two years. Dr. Simpson ordered bilateral nerve conduction velocity studies done on Paris's hands. After Dr. Simpson received the report from that testing, Dr. Simpson told Paris that he did not have carpal tunnel syndrome in either hand. Paris did not pursue further testing at that time. The attorney-client relationship between Paris and the attorneys who sponsored the screening lapsed on February 11, 2003.

Paris's condition continued to get worse. Paris went to Dr. Marsha Hixson, an orthopedic surgeon, on July 2, 2003. On a medical intake sheet for Dr. Hixson, Paris wrote that he had begun

to experience symptoms in June of 2000.  Dr. Hixson ordered another round of testing to determine whether Paris had carpal tunnel syndrome.  After the testing, Paris was diagnosed with carpal tunnel syndrome.  Dr. Hixson performed carpal tunnel release surgery on Paris's right hand on July 24, 2003, and on his left hand on September 11, 2003.  On July 29, 2003, Paris provided Union Pacific with a report of personal injury describing his carpal tunnel syndrom.  Paris listed the date of his occupational injury as July 24, 2003.

Paris again hired one of the two law firms that had organized the carpal tunnel screening on August 12, 2003, to represent him in his occupational injury claim against Union Pacific.  On May 28, 2004, Paris was interviewed by Mike Reed, a claims representative for Union Pacific.  On July 8, 2004, Paris filed suit in federal court against Union Pacific.  Union Pacific has now moved for summary judgment, arguing that Paris's claim against Union Pacific accrued no later than June 22, 2001, and is therefore barred by FELA's three-year statute of limitations.

## III.

No action may be maintained under FELA unless it was commenced within three years from the day the cause of action accrues.  45 U.S.C. § 56.  For incremental occupational diseases like carpal tunnel syndrome, federal courts use the discovery rule to determine when a cause of action accrues under FELA's statute of limitations.  The Supreme Court developed the discovery rule in *Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949), and *United States v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979).  The rule states that a plaintiff's cause of action does not accrue until the employee "is aware or should be aware of his condition." *Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 906 (8th Cir. 1980).  Put another way, the FELA period of limitations starts to run when the plaintiff knows, or in the exercise of reasonable diligence

should know, of both the existence and cause of the injury. *Lhotka v. United States*, 114 F.3d 751, 753 (8th Cir. 1997); *Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990).

Paris filed suit on July 8, 2004. Paris's cause of action is barred if it accrued before July 8, 2001. The symptoms of Paris's carpal tunnel syndrome began to manifest themselves in 2000. Merely experiencing symptoms of a disease is not necessarily sufficient for a plaintiff's cause of action to accrue. *See, e.g.*, *Green v. CSX Transp., Inc.*, 414 F.3d 758, 764 (7th Cir. 2005) ("Presumably there is room for a *de minimis* concept where there has been some tortious impact but such inconsequential manifestations that a reasonable person would not consider he was either injured or that it was appropriate to make inquiry."). A plaintiff's belief that his injury is serious and work related, however, will start the running of the statute of limitations. *See, e.g.*, *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1236 (10th Cir. 2001); *Albert v. Me. Cent. R.R. Co.*, 905 F.2d 541, 544 (1st Cir. 1990); *Townley v. Norfolk & W. Ry. Co.*, 887 F.2d 498, 501 (4th Cir. 1989); *Emmons v. S. Pac. Transp. Co.*, 701 F.2d 1112, 1122 (5th Cir. 1983).

Union Pacific argues that Paris was in fact aware of his condition and its cause in 2000. Union Pacific bases that argument on Paris's responses to questions from Mike Reed during their July 24, 2003, interview and Paris's medical records. The medical records establish that Paris told doctors that he began experiencing symptoms in 2000. They say nothing about whether Paris believed in 2000 that his symptoms were caused by an occupational injury or disease. Paris's responses to Reed's questions, when read in a light most favorable to Paris, can be taken to mean that Paris was not sure what was causing his hand problems. Reed asked, "Okay in the year 2000 when you were having problems, did you think work was causing it?" Paris responded, "probably." Later in the interview, Reed recharacterized Paris's response to Reed's first question: "Okay and I

5

think you told me earlier you thought work was causing your problems in the year 2000," to which

Paris responded, "yes."  When given a chance at his deposition to explain what he meant when he

told Reed "probably," however, Paris gave the following answers:

Q.      Back when you were having the symptoms, the year before you were tested
        by Dr. Cohen's technician, you thought your symptoms were caused by your
        work at the railroad.  Is that true?
A.      I didn't know.  I didn't know what was – what was causing it.  All I knew, I
        was having problems with my hands.
Q.      Had you ever told Mike Reed that you thought – before you were tested – that
        your symptoms were being caused by your work at the railroad?
A.      I may have.
                                        * * *
Q.      Is there any doubt that you told Mike Reed that you thought back in the year
        2000 your problems were being caused by work?
A.      Evidently I told him that.  I'm sure I did.
Q.      And isn't that the case, that in the year 2000 you thought your symptoms
        were being caused by work?
A.      Well, I thought it could be.  I didn't know.
Q.      You thought it could be?
A.      Well, it's possible.
                                        * * *
Q.      I think you made a statement to Mr. Reed that Mr. McKay read to you earlier
        today, where you said that you thought that it might be caused by what you
        did at work?
A.      It's possible.
Q.      All right.  Did you think it was also possible that it was caused by something
        else?
A.      It could be.
Q.      All right.  Bottom line is you just didn't know –
A.      Didn't know.
Q.      – at that period of time?
A.      Right.
                                        * * *
Q.      And you told Mike Reed that you thought in 2000 that your symptoms were
        caused by the railroad?
A.      I said it was possible.  I thought that's what I said.  Did I not say possible?
Q.      That thought crossed your mind, didn't it?
A.      Well, anything could happen, you know.  I knew that I worked for the
        railroad.  It's the only place I worked that long, the activity I had.
Q.      The railroad was the only activity you had?

A.      Just about – just about the only strenuous activity I had.

Ordinarily, a plaintiff cannot create a genuine issue of material fact by filing an affidavit that contradicts his sworn deposition testimony, but courts have on occasion allowed a plaintiff to file an affidavit that explains the apparent inconsistency between the deposition testimony and a later affidavit. *See*, *e.g.*, *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980); *Van Zweden v. S. Pac. Transp. Co.*, 741 F. Supp. 209, 210, 212 (D. Utah 1990) (genuine issue of material fact existed where plaintiff filed affidavit attempting to explain that previous statements he made concerning causation reflected benefit of hindsight).  Here, Paris gave a recorded statement that has created problems for him.  His later, sworn testimony in his deposition attempts to explain his prior statement to make it less harmful to his case.  His testimony is not a paradigm of consistency, but neither is it transparently a sham.  *Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir. 1977).  Paris is obviously an unsophisticated witness.  At both points in the interview when he told Reed that he thought in 2000 that his symptoms were work-related, Reed actually made the statement and got Paris to agree.  If Paris were more sophisticated, or if he had said in his own words that he believed in 2000 that he had a work-related injury or disease, I would be more likely to find his subsequent explanation to be a sham.  Whether his subsequent explanation is credible is a close enough question that it is best left to the jury, which will be able to see Paris testify in person and will therefore be in the best position to decide whether or not to believe his explanation.  *Cf. Kim v. Ingersoll Rand Co.*, 921 F.2d 197, 198-99 (8th Cir. 1990) (holding that plaintiff's subsequent explanation as to the apparent discrepancy in his deposition and trial testimony was sufficient to allow the jury to decide the issue of credibility); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) (concluding that the plaintiff's subsequent affidavit was not enough to create a factual issue

for the jury because the plaintiff provided no reasonable explanation as to why it was inconsistent with prior testimony).

Union Pacific also argues that knowledge of Paris's injury and its cause should be imputed to Paris from his lawyers. That argument presupposes that Paris's attorneys knew before July 2001 that Paris had developed carpal tunnel syndrome as a result of his work at Union Pacific. The evidence in the record reflects otherwise. Paris did sign a power of attorney on the date of the carpal tunnel screening that allowed the attorneys who had organized the screening to "represent [Paris] in [his] claim for damages against [his] railroad employer, as a result of Carpal Tunnel Syndrom." The power of attorney contained a proviso, however, that allowed it to be revoked if no carpal tunnel syndrome was discovered at the screening.[1] Dr. Cohen testified that hundreds of individuals attended the carpal tunnel screenings, yet a diagnosis of carpal tunnel syndrome was not made in each case. Dr. Cohen would send a letter or report to the attorneys who sponsored the screenings that told them the result of the screening, i.e. whether an individual was at risk for carpal tunnel syndrome or not. There is no evidence that Paris's attorneys knew before Dr. Cohen presented them with his findings in August of 2001 that Paris suffered from work-related carpal tunnel syndrome.

Regardless of whether Paris knew that his work was causing serious injury to his hands, actual knowledge is not necessary. A plaintiff's cause of action will accrue when the evidence shows that a plaintiff should have known he had a serious occupational injury. *See, e.g.*, *Mix v. Del. & Hudson Ry. Co., Inc.*, 345 F.3d 82, 87 (2nd Cir. 2003); *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 777 (6th Cir. 2001); *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 866 (7th Cir.

---

[1] The power of attorney expressly stated that it could be revoked "if medical evidence or x-rays disclose that [the individual signing the power of attorney has] no compensable disease."

1996); *Bealer v. Mo. Pac. R.R. Co.*, 951 F.2d 38, 39-40 (5th Cir. 1991). At that point, a plaintiff has a duty to investigate both the injury and any suspected cause. *Fries*, 909 F.2d at 1096. The real issue, then, is whether Paris's experiencing of tingling, numbness, and pain in his hands should have caused him to seek medical attention and discover the cause of these symptoms earlier. Paris testified that he went to the June 2001 carpal tunnel screening to see if something was wrong with his hands. It is undisputed that Paris did not learn the results of his screening until August of 2001. The issue is when Paris knew or should have known of the existence and cause of his injury. *Lhotka*, 114 F.3d at 753. His knowledge, in the exercise of due diligence, is dispositive. *Mix*, 345 F.3d at 89. A reasonable jury could conclude that Paris was exercising due diligence when he took advantage of the opportunity for a screening on June 22, 2001, and that he would not reasonably have known of the existence and cause of his injury until he received the results of that screening in August 2001.

The symptoms that Paris experienced through July of 2001 were numbness, tingling, and some pain in his hands. Paris testified that through 2001—and possibly as late as 2002—the symptoms would come and go. That the symptoms were intermittent suggests that the carpal tunnel was not serious enough to put Paris on notice that he had a right to sue. *Cf. Green*, 414 F.3d at 764 (holding that plaintiff's minor shoulder pain was not enough "to put a reasonable person on notice that she had suffered a cognizable injury and must sue or risk losing her right to do so"); *Sabalka v. The Burlington N. & Santa Fe Ry. Co.*, 54 S.W.3d 605, 612 (Mo. Ct. App. 2001) (holding that intermittent symptoms would not have suggested to a reasonable person that a compensable occupational injury occurred). Unlike some plaintiffs whom the courts have held should have known of the existence and cause of an injury, before he went to the screening on June 22, 2001, Paris's

9

intermittent symptoms had not concerned him to the point that he had sought medical attention. *Cf.* *Tolston*, 102 F.3d at 866 (finding that plaintiff should have exercised reasonable diligence in discovering the cause of her injury when she had sought medical treatment for her injury on numerous occasions). In fact, Paris did not seek treatment until June 2002, when he consulted Dr. Simpson, who told him that he did not have carpal tunnel syndrome.

In *Sabalka v. The Burlington Northern and Santa Fe Railway Co.*, the court rejected the defendant's argument that the plaintiff should have known about his injuries because of intermittent tenderness, swelling, and pain in the wrist prior to the three-year statutory period. *Sabalka*, 54 S.W.3d at 612. The court stated that, while it was not necessary for a physician to have diagnosed the plaintiff's injury in order for the plaintiff to have been charged with knowledge of the injury, the plaintiff must have at least been made aware that there was an injury of a compensable nature. *Id.* at 610-11. In *Sabalka*, the court held that because the plaintiff's symptoms were transitory, they did not incapacitate him in any way, and they were not severe enough to cause him to consult a physician, those symptoms would not have caused a reasonable person to believe that any compensable damage to any bodily structure had taken place. *Id.* at 612. As in *Sabalka*, Paris experienced symptoms only intermittently. The symptoms Paris felt in his hand were not serious enough for him to seek medical treatment. There is no evidence that those symptoms interfered with Paris's ability to work in a substantial way before July 8, 2001.

Paris testified that his symptoms got progressively worse after the June 2001 testing, yet his case of carpal tunnel syndrome was still difficult to diagnose in June of 2002, as evidenced by the fact that the nerve conduction exam ordered by Dr. Simpson came back negative. When a neurologist could not even determine the existence of the injury in June of 2002, this Court cannot

say as a matter of law that, because of the intermittent symptoms Paris experienced, he should have

known before July 8, 2001, that he had carpal tunnel syndrome caused by his railroad work.  It is

certainly true that a medical diagnosis is not strictly necessary for a court to charge a plaintiff with

constructive knowledge of his work-related injury.  *See, e.g.*, *Emmons*, 701 F.2d at 1122.  But a

medical specialist's inability to diagnose symptoms almost two years after the date the defendant

argues constructive knowledge should be charged to the plaintiff is certainly probative evidence

weighing against such a finding of constructive knowledge, especially when, as is the case here, the

plaintiff testifies that his symptoms got progressively worse in the interim.

## CONCLUSION

This is a case in which different inferences can reasonably be drawn from the evidence.

Therefore, it is the function of the jury to determine what inferences will be drawn.  *Madel v. FCI*

*Marketing, Inc.*, 116 F.3d 1247, 1252 (8th Cir. 1997).  Union Pacific's motion for summary

judgment is DENIED.  Document #43.

IT IS SO ORDERED this 30th day of May, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE